### DUNNELL *vs.* HENDERSON.

1. An entry made by one partner on the books of the firm during the co-partnership, will, after its termination, be evidence against the other partner, if he at the time knew of the entry, or had an opportunity to examine the books and did not dissent from it.

2. If one partner agrees to contribute the stock on hand in his business and the other assets of that business, against a specified sum to be put in by the other partner, this stock and assets, and that only, must be put in as his capital in the concern, whether it exceeds or falls short of the amount stipulated by the other partner.

Dunnell *v.* Henderson.

3. A new foundation for a new engine put in a mill in place of an old one discarded, built for it because the foundation of the old engine, if repaired, was not sufficient for the new engine, must be considered as an addition and not as repairs under articles distinguishing additions from repairs.

4. It must appear from the master's report and the proofs and documents accompanying it, that exceptions which would be valid if true, are founded on fact.

The argument in this case was upon exceptions to the report of the master, stating the accounts between the parties.

*Mr. C. Parker*, for exceptant.

*Mr. T. Runyon*, for defendant.

THE CHANCELLOR.

The master's report is a statement of the accounts between the defendants, who were partners, under the name of A. L. Dunnell & Co. The partnership was entered into January 1st, 1852, was dissolved by mutual consent on the 25th of May of that year, and again renewed on the 29th of August, 1853, and finally dissolved September 28th, 1855. The business of the firm was the manufacture of paper, in which Dunnell had been engaged for years. It was to be carried on at the works and establishment owned by Dunnell, who was to superintend the manufacture. Henderson was to attend to the financial matters.

By the original articles, the defendant was to contribute $5000 of capital. The complainant was to furnish the use of his mill and machinery, and also the paper and stock on hand at cost. And this $5000 furnished by the defendant, and the paper and stock of the complainant on hand, was to constitute the joint capital in the business. All expenses of manufacturing, repairs to machinery, new machinery and fixtures, to supply the place of any worn out, and other incidental expenses, were to be paid from the profits, but additions to the mill and machinery were to be paid for by the complainant. The complainant was to receive $1500 yearly for the use of

his mill and machinery, the legal interest on all moneys furnished, and $624 yearly for his services. The defendant was to receive legal interest on the money he might furnish, and $312 yearly for his services. The balance of the profits was to be divided equally.

The defendant contributed his $5000 in notes, which were immediately endorsed over and paid by the complainant to M. H. Woodruff, in payment of a debt of the complainant to him for money before advanced to and used by the complainant in his business. The complainant also used other assets of the firm to pay his individual liabilities, which induced the defendant to ask for and the complainant to give to defendant a mortgage for $5000 as security for his capital advanced to the partnership. This mortgage was given and dated on the 12th day of February, 1852, in pursuance of a provision in the articles requiring security from either partner, who should draw out more than his share of the profits.

After the dissolution of May 25th, 1852, the defendant continued in the employ of the complainant as book-keeper, or confidential adviser, at a yearly salary of $500, until the renewal of the partnership. The articles for renewal, dated August 29th, 1853, provided that the partnership should be continued to January 1st, 1857, and that its affairs should be settled from the commencement of the partnership, as if no dissolution had taken place. That the contribution should be the same as stipulated in the original articles, and that the partnership should be carried on under the original stipulations, except that the yearly rent to be paid should be only $1000 instead of $1500. The complainant agreed to put in the mill a new paper and drying machine and two new engines, and while these were in use the rent was to be again $1500; and until then, complainant was to be allowed six per cent. interest on the cost of a new wheel-house, machine wheel, and cylinder, that had been put in by him.

Before noticing the exceptions I will state my view of the effect of these articles as to the capital to be contributed by each partner. It is clear that the defendant was to contribute

$5000. The complainant was to contribute the stock and paper on hand. There is nothing in the articles or otherwise, before me, to show that he guaranteed that these should be of the value of $5000, or any other value. If they were worth only $50, that was all that he was required to contribute; if they were worth, as he is said to have represented them to be, twice the defendant's contribution, he was bound to put them in as his part of the capital. The paper and stock were to be put in as they existed, however depreciated, but on the other hand free from all liens or debts of the complainant, and were to be put in, if required, at the place of business of the firm, without charge for transportation.

The value put upon this stock and paper by the master is $7055.30, as appears by Schedule A, of which the first two items are debts, not stock. This is the amount which the articles required the complainant to furnish toward the capital and to keep in the capital. The first exception is to the value put on this stock by the master; he valued it at $85 per ton, as credited to the complainant by the defendant in the books of the firm. For the reasons given by the master, I am satisfied that this credit is correct. The books were kept by the defendant in the factory, and were open to the inspection of the complainant, as provided in the articles of partnership. It is not positively shown that he did examine them, but he could have done it. The rule is, that in such case the books are evidence against him of the entries. The price was entered as that at which the articles were put in. 2 *Phill. Ev.* 680; *Heartt* v. *Corning*, 3 *Paige* 566; *Caldwell* v. *Leiber*, 7 *Paige* 507; *United States Bank* v. *Binney*, 5 *Mason* 188.

Besides, in this case, after the first dissolution these books, with these entries in them, were kept for more than a year as the individual books of the complainant. He must be presumed, then, to have known their contents at the renewal of the partnership. If they were to be put in at the price claimed by the complainant, it would amount to over $10,000

his valuation being $126 per ton, and exceeding the entry by nearly fifty per cent.

The liens upon the goods in the hands of factors, and the cost of transportation, together with all debts paid for Dunnell, were rightly charged by the master to him. And if these, as stated by the master, reduced the value of the stock when received, the deficiency to be charged to Dunnell would be what the net value, $2486.82, fell short of the $5000 contributed by defendant and appropriated by Dunnell, making the sum of $2513.18, as charged by the master.

The third exception is to a charge entered on the partnership books May 5th, 1852, in the usual course of business, and for the reasons above stated must be presumed to be right until proved to be erroneous. Of this I find no evidence.

The fourth exception, so far as regards freight, comes within the grounds stated for overruling the first and second, and it nowhere appears that the residue of the charge was for the value of paper. The books do not so state it. The value of the paper in Schedule A is more than double this charge.

The fifth exception is to seventy-four items, particularly specified in it, which it alleges the master has improperly charged against the complainant. I cannot discover, from the master's report or schedules, whether any of them were charged by him against the complainant, except those contained in the sixteenth item of the bill of particulars, annexed to the report. I am satisfied that the foundation in the new engine ought to be considered as part of the new engine; that a new foundation was required; that the old one repaired would not have answered for the new engine. These items are, therefore, properly charged to Dunnell. As to the other items in that exception, it may be possible for an expert accountant, by going through the books for that year, to find them, and to show that these are part of the cash included in the cash charge in the master's schedule. As the case is before me, I must hold the exception as to them not to be sustained.

The sixth exception regards the rent credited October 1st,

1856. There is no such credit. If it is intended to be the rent credited September 28th, 1855, the exception depends upon the time during which the new paper and drying machine and the new engines, had been in use in the mill. If they had been in use for the whole of that year, the credit should have been at the rate of $1500 per annum, or $1112, not $1391, as claimed. But it nowhere appears that they had been completed and in use from January 1st, 1855, and therefore no error appears in the master's account.

The item of $506.12, or Lyon's bill for repairs to boiler, in the seventh exception, was for work done after the final dissolution of the partnership, and ought not to be allowed; the partnership took the mill as it was, and were not bound to leave it in good repair. It does not appear that the other items excepted to were allowed by the master, and if they were the evidence does not show them erroneous.

The remaining exceptions seem to be a presentation of the same grounds that I have considered, in a new form, except the division of $10,000 as profits, which was not before presented. The evidence is, that there were profits, and the result of the account, as stated by the master in schedule, shows that there must have been profits. Each partner had been credited with the capital contributed, and had drawn it out in full; each had also been credited with $5000 profits. The amount then due from Dunnell added to the amounts afterwards paid out for him, and the assets on hand and collected, seem to be sufficient to pay the amount due to Henderson, so that if Dunnell is able to pay his indebtedness the firm would be solvent.

But if no profits had been earned, as all the capital had been repaid, this error would make no difference in the result; if that allowance were deducted from both accounts it would make Dunnell's debt $5000 more than stated, or $7897.73, and Henderson's credit $5000 less, or $953.98, and these, added and divided equally, would make the debt of the complainant to the defendant, on November 8th, 1855, $4425.86, precisely as in the master's report.

The exceptions must all be overruled.